UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | | |
|---|---|---|
| LINDA G. GODSEY | ) | |
| | ) | |
| V. | ) | NO. 2:08-CV-326 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |

## REPORT AND RECOMMENDATION

Plaintiff has filed this appeal of the Commissioner's final decision to deny her applications for disability insurance benefits and supplemental security income under the Social Security Act. Both plaintiff and the defendant Commissioner have filed Motions for Summary Judgment [Docs. 10 and 14]. This action has been referred to the United States Magistrate Judge under the standing orders of this Court and 28 U.S.C. §636.

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human*

*Services*, 846 F.2d 345, 349 (6th Cir. 1988).

Plaintiff was 50 years old at the time the Administrative Law Judge ["ALJ"] rendered his decision on May 12, 2008. She had a high school equivalency education. Her past relevant work experience was as a forklift operator, which was classified as light to medium exertionally and semi-skilled; as an animal caretaker which was heavy and unskilled; as a packer which was heavy and unskilled; and as a dip line worker which was unskilled and medium to heavy. Plaintiff alleges that she became disabled on August 7, 2006. She says her impairments were residuals of a stroke to the left side of her body, cervical problems, thyroid and acid reflux problems, depression and anxiety, and a right shoulder impairment.

The ALJ found that the plaintiff had a severe impairment to her right shoulder. He found that the plaintiff had the residual functional capacity to lift 30 pounds, push and pull 15 pounds, stand and walk 7 hours, stand for 3 hours and walk 1 hour without interruption, sit 8 hours and up to 4 without interruption, could not climb stairs, ramps, ladders or scaffolds, could not make frequent postural changes including stooping, kneeling and crouching, and could not be around unprotected heights or moving mechanical parts. This finding of residual functional capacity was based upon the consultative examination and medical assessment of Dr. Krish Purswani dated February 25, 2008 (Tr. 359-370).

At the hearing before the ALJ, Cathy Sanders, a vocational expert, appeared. She was asked by the ALJ if she had reviewed the plaintiff's file and had listened to the testimony at the hearing. She answered affirmatively (Tr. 41-42). She was asked if there were jobs a person could perform of plaintiff's "same age, same educational level, same work experience" who had the limitations set forth by Dr. Purswani. (Tr. 42). At the reduced range of light

2

work level, Ms. Sanders stated that there were 12,000 jobs in the region and 450,000 in the national economy which such a person could perform. Examples given were servers and counter clerks, interviewers, telephone answering receptionists, couriers and a part range of cashiers. (Tr. 43).

Based upon the residual functional capacity derived from the report of Dr. Purswani and the jobs identified by Ms. Sanders, the ALJ found that the plaintiff was not disabled. (Tr. 19-21).

The medical evidence before the ALJ is fairly summarized in the defendant's brief as follows:

> On August 7, 2006, Plaintiff dislocated her right shoulder (Tr. 220). X-rays following the reduction of her shoulder showed no fractures (Tr. 226). She was seen two days later because her fingers were numb and she has spasms in her right-shoulder muscles (Tr. 229). X-rays of Plaintiff's neck showed no acute injury, but showed degenerative disc disease with "slight loss of normal disc height" and a "small amount of posterior osseous ridging" at her C5/6 vertebrae level, with "no evidence of definite neural foraminal narrowing" (Tr. 236). X-rays of Plaintiff's right shoulder showed no acute injury with "[m]inimal enthesopathic degenerative changes" and a "small amount of subacromial spurring" (Tr. 237).
>
> On August 17, 2006, Greg Stewart, M.D., an orthopaedist, evaluated Plaintiff's right shoulder injury and recommended continued conservative treatment consisting of wearing a sling for three to four weeks with possible future nerve conduction study if Plaintiff continued to have symptoms of neurapraxia (Tr. 296-297).
>
> On September 1, 2006, Plaintiff sought emergency treatment for left-arm and leg numbness focused in the fourth and fifth digits of her left hand and her left foot, and left-leg weakness, but poor effort was noted (Tr. 239). Plaintiff's symptoms were from an alleged fall that occurred after Plaintiff had been drinking alcohol, including six shots of tequila (Tr. 241, 245). Michael Spady, M.D., found that Plaintiff had reduced strength in her left arm and leg (Tr. 240). He opined that Plaintiff would benefit functionally from physical and occupational therapy (Tr. 240). George Wilson, M.D., also examined Plaintiff, concluding that her left-hand paresthesias was consistent with nerve dysfunction, which may have been triggered by a fall, but not a stroke (Tr. 242). He noted poor effort as to Plaintiff's left leg, and concluded that

3

more testing was needed for proper diagnosis (Tr. 242). He did note that Plaintiff "obviously needs to stop smoking and stop alcohol intake" (Tr. 242). Ultrasound of Plaintiff's carotid artery and echocardiogram were essentially normal (Tr. 243). MRI of Plaintiff's brain and CT scan of her head were normal (Tr. 251, 253). X-rays of Plaintiff's left hip were negative (Tr. 245, 250). It was noted that Plaintiff was ambulating with minor difficulty prior to her discharge (Tr. 245).

On September 8, 2006, Plaintiff saw Kenneth Weaver, M.D., and reported to him that she had dislocated her shoulder in August 2006 and had fallen on September 1, 2006 (Tr. 255). Dr. Weaver made no exam findings concerning Plaintiff's shoulder or left side, but he did note that Plaintiff's prognosis was good (Tr. 255).

At a follow-up appointment with Dr. Stewart on September 11, 2006, Plaintiff reported mild pain in her right shoulder (Tr. 295). Dr. Stewart told Plaintiff she could begin using her arm without the sling, and that they would begin some range of motion and strengthening of the right shoulder as well as some rotator cuff exercises (Tr. 295). He also gave Plaintiff a referral to physical therapy, though Plaintiff later reported she did not seek physical therapy due to monetary reasons (Tr. 295). Dr. Stewart again saw Plaintiff on October 16, 2006, at which time he noted that Plaintiff's motion had "significantly improved" (Tr. 294). He recommended continued exercises for her right shoulder, prescribed robaxin for neck spasms and ultram for pain, and said that any future visits would be on an as-needed basis (Tr. 294).

On October 24, 2006, Reeta Misra, M.D., assessed Plaintiff's residual functional capacity and found that she could lift 50 pounds occasionally and 25 pounds frequently, and could sit for six hours and stand and/or walk for six hours, with no other limitations (Tr. 298-305). Dr. Misra formed her opinion after considering Plaintiff's treatment notes and objective medical testing relating to her right-shoulder injury in August 2006 and her complaints of left-sided weakness in September 2006 (Tr. 305). Dr. Misra opined that Plaintiff's shoulder impairment would improve within 12 months and that Plaintiff's allegations were partially credible due to the evidence of her poor effort during her exam (Tr. 305).

In December 2006, Dan Levesque, D.C., a chiropractor, evaluated Plaintiff (Tr. 343-354). He found that Plaintiff's spine was misaligned at the L5, T6, and C7 vertebral levels, which caused Plaintiff pain (Tr. 353). He also opined that Plaintiff had herniated discs at these levels that were causing inflammation of the spinal nerve root, which he opined was the likely cause of Plaintiff's arm and leg pain and weakness (Tr. 353). He opined that Plaintiff "likely has several torn rotator cuff muscles in her right shoulder as well as osteoarthritis" (Tr. 353). Mr. Levesque also diagnosed Plaintiff with "osteoarthritis of the spine, degenerative disc disease, carpal tunnel syndrome, headaches, chronic fatigue, insomnia, acid reflux and anxiety disorder" (Tr. 353). Mr. Levesque concluded that Plaintiff had "permanent spinal damage that

4

will require chiropractic care for the rest of her life to avoid more problems" (Tr. 354).

On March 7, 2007, Saul Juliao, M.D., assessed Plaintiff's residual functional capacity and found that she could lift 50 pounds occasionally and 25 pounds frequently, could sit for six hours and stand and/or walk for six hours, and was limited in her upper extremities (Tr. 334- 341). He opined that Plaintiff could occasionally climb ladders, ropes, and scaffolds, could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and could frequently handle, finger, and feel with her right arm, with no other limitations (Tr. 336-337). Dr. Juliao based his conclusions on Plaintiff's treatment records, including clinical and diagnostic testing (Tr. 336). Dr. Juliao noted that Plaintiff's alleged pain and fatigue did not further reduce her functional capacity (Tr. 336).

At the request of Plaintiff, Dr. Weaver composed a letter concerning Plaintiff's impairments and disabilities dated December 21, 2007 (Tr. 357-358). Dr. Weaver explained that he had treated Plaintiff since 1993, and that he had seen her in December 2007 (Tr. 357). In the first two paragraphs of his letter, Dr. Weaver explained Plaintiff's impairments as shown in the previously discussed treatment notes (Tr. 357). Dr. Weaver opined that Plaintiff could lift no more than 10 pounds occasionally and less than 10 pounds frequently (Tr. 357). He opined that Plaintiff could not use her hands and arms in rapid, repetitive work, and had difficulty in gross and fine manipulation (Tr. 357). He opined that she should not attempt a job that required her to bend at the neck because of her cervical spine problems (Tr. 357). He opined that she could occasionally stoop, bend, and kneel, but should never work around heights or moving machinery (Tr. 357).

Dr. Weaver opined that Plaintiff's pain would likely cause her to miss work more than two days a month (Tr. 357). He also opined that her pain would impair her ability to concentrate and persist and complete tasks (Tr. 358). He opined that her problems with manual dexterity would make it difficult for her to maintain persistence, pace, and to complete job tasks in work requiring manual dexterity (Tr. 358). Due to Plaintiff's age, Dr. Weaver concluded that his opined limitations were permanent and Plaintiff would not experience any significant improvement (Tr. 358).[1]

On February 25, 2008, Krish Purswani, M.D., evaluated Plaintiff at the request of the ALJ (Tr. 359-371). Dr. Purswani considered Plaintiff's complaints and history of right-shoulder dislocation, numbness in her left leg, and right arm and hand, her previous right-arm injury, the presence of cysts in her left wrist, insomnia, acid reflux, and thyroid problems (Tr. 359-360). In his physical exam, Dr. Purswani found that Plaintiff had normal range of motion in her neck and it was not tender (Tr. 361).

---

[1] Dr. Weaver also indicated that he saw no evidence of malingering or exaggeration of symptoms in plaintiff.

5

He found that both of Plaintiff's shoulders were not tender, her right shoulder had range of motion to 90 degrees, and her left shoulder had normal range of motion (Tr. 362). He found that Plaintiff's knees, elbows, wrists, and hands had normal range of motion with no tenderness (Tr. 362). He saw no scoliosis in Plaintiff's back and found that Plaintiff's back straight leg raise was 80 degrees right and 60 degrees left — standing, and 30 degrees right and 20 degrees left — sitting (Tr. 362). He found that Plaintiff could bend forward 90 degrees, backward 25 degrees, and had normal lateral range of motion bilaterally (Tr. 362). Dr. Purswani found that Plaintiff's grip strength was 4.5/5 on the right and normal on the left, and her strength in her arms and legs was normal (Tr. 362). He found that her toe and heel strength was normal, she was able to stand on one foot, and her tandem gait was normal (Tr. 362).

Dr. Purswani indicated that he reviewed Plaintiff's old medical records before making his assessment (Tr. 362-363). Based on his exam and review of Plaintiff's history, Dr. Purswani opined that Plaintiff could lift 30 pounds half the time in an 8-hour day and up to 20 pounds frequently (Tr. 364-365). He opined that Plaintiff could stand and walk for seven hours in an eight hour day, and could sit for eight hours (Tr. 364). Dr. Purswani based his limitations on Plaintiff's residual right shoulder pain from her previous dislocation and her upper and lower extremity paresthesias (Tr. 364-365). He further opined that Plaintiff's right shoulder pain would limit her pushing and pulling ability to about 15 pounds of force on the right side up to one-half of the day, but opined that she could perform all other hand and arm movements frequently with her right hand and continuously with her left hand (Tr. 367). He limited Plaintiff's activity climbing stairs, ramps, ladders, and scaffolds to occasionally because of her right shoulder pain and "slight loss" of right grip strength, but found that she could engage in all other postural activities frequently up to one-half to two-thirds of the time (Tr. 368). As for environmental limitations, Dr. Purswani opined that Plaintiff should never work at unprotected heights or around moving mechanical parts, could frequently operate a motor vehicle with power steering about four hours a day, and was otherwise not limited (Tr. 369).

[Doc. 15, pgs. 2-7].

Plaintiff alleges three issues. First, plaintiff assets that the ALJ erred in finding that she was 48 years of age, or a "younger individual" under the Medical-Vocational Guidelines [the"Grid"] as opposed to 50 years of age, which would be "closely approaching advanced age." Second, plaintiff asserts that the ALJ erred in giving great weight to Dr. Purswani's opinions while giving little weight to the opinion of Dr. Kenneth Weaver, the plaintiff's treating physician. Finally, plaintiff asserts that the ALJ's questions posed to the VE were

6

flawed in three respects: She states that the ALJ did not specify the plaintiff's age and education, "mistakenly relied on the opinions of Dr. Purswani," and the "findings that the Plaintiff retained a residual functional capacity for light work did not take into account the VE's testimony that the Plaintiff's ability to perform sedentary work was seriously eroded." [Doc. 11, pg. 2].[2]

Obviously, the paramount issue is whether the ALJ erred in giving greater weight to Dr. Purswani's opinions derived from his consultative examination of the plaintiff than he gave to the opinions of Dr. Weaver, her family physician.

Dr. Weaver's letter is certainly more detailed than those of most treating physicians in Social Security cases. But the controlling weight to which plaintiff asserts Dr. Weaver's letter is entitled is only afforded if it is supported by medical findings and is consistent with substantial evidence in the record. 20 C.F.R. § 404.1527(d). If the ALJ uses the "sit and squirm" test, or his own medical perceptions, or even relies only the opinions of non-examining State Agency physicians as his only bases for discounting a treating physician's supported findings, then the adjudication is tainted. If, however, there is substantial evidence to support the findings of the ALJ, and if he adequately discusses his justification for not giving absolute deference to the opinion of a treating physician, he is entitled to do this as the finder of fact.

It is true that Dr. Weaver saw the plaintiff for routine visits for many years. Prior to her disability onset date of August 7, 2006, almost all of his treatment was for abdominal and

---

[2]Other issues which were *not* raised include the ALJ's finding that the plaintiff did not have a severe mental impairment. Issues not raised in the Motion are waived.

7

gynecological conditions. (Tr. 254-87). The first exam following her fall and right shoulder on August 7, 2006, and her treatment on September 1st through 3rd, 2006, for left side numbness took place on September 8, 2006. Dr. Weaver recounted her medical experiences from the previous 30 days and stated her prognosis was "good." (Tr. 255). She missed her other appointments with Dr. Weaver in 2007, until seeing him again on December 18, 2007. Once again, her reiterated her subjective complaints. (Tr. 386). In his hearing decision, the ALJ noted the paucity of objective findings to support Dr. Weaver's severe assessment in December, 2007.

While plaintiff argues that Dr. Purswani only saw the plaintiff on one occasion, Dr. Weaver only saw her on two occasions after the incidents upon which her disability claim is based. Dr. Purswani's examination was far more detailed and specific in its findings than either of Dr. Weaver's, at least from the written records, which are all that the ALJ had before him when reviewing the evidence. Dr. Weaver's opinion was not well-supported and was inconsistent with the thorough examination and findings of the consultative examiner. The ALJ did not err in affording it little weight.

Plaintiff also argues that Dr. Purswani did not have before him cervical x-rays, which she maintains would surely have changed his opinion. The x-rays taken at the emergency room on August 9, 2009, showed "slight loss of normal disc height" and "reactive endplate...changes at C5/C6. A "small amount of posterior osseous ridging" was "likely present at this level." There was no evidence of definite neural foraminal narrowing. The impression was no evidence of acute injury to the cervical spine and degenerative disc disease with a small amount of posterior osseous ridging at C5/6. (Tr. 236). Dr. Stewart noted these

8

findings when he saw the plaintiff on August 17th, but noted no cervical condition in his diagnostic impression, only the injury to plaintiff's right shoulder, for which he elected conservative treatment. The absence of these x-rays from the materials provided to Dr. Purswani, given the minimal findings noted by the doctors who took and interpreted them, does not detract from the evidentiary weight afforded Dr. Purswani's opinion by the ALJ. It was substantial evidence, and far better supported than the opinion of Dr. Weaver.

The plaintiff asserts that the ALJ erred in finding that the plaintiff was 48 years old rather than 50. She was 48 years old on her disability onset date, but 50 when the ALJ rendered his decision. She asserts that this distinction is critical due to the fact that, under the Medical-Vocational Guidelines, a 48-year old with plaintiff's education and vocational history who was limited to sedentary work would be "not disabled" under the Guidelines, while a 50-year old would be "closely approaching advanced age" and be "disabled." The Medical-Vocational Guidelines were not utilized in this case, and could not be since the plaintiff did not precisely match all four criteria of the grid, which are residual functional capacity, age, education and previous work experience. The plaintiff was found to be incapable of performing the full range of light work. The ALJ elected to utilize a vocational expert who identified a significant number of jobs. Where a person is "in between" sedentary and light work, use of a vocational expert is required. *See*, *Social Security Ruling 83-12, Damron v. Secy. of H.H.S.*, 778 F.2d 279, 282 (6th Cir. 1985)

Finally, plaintiff asserts that the question posed to the VE was flawed for three reasons. First, because he did not specify the plaintiff's age in the question. Second, because he relied on Dr. Purswani's findings. Third, because plaintiff's ability to perform sedentary work was

9

seriously eroded by her lack of manual dexterity.

Plaintiff testified that she was 50 years of age and had her GED. (Tr. 29). The VE testified that she had reviewed plaintiff's file and listened to her testimony. The ALJ asked the VE to assume an individual of plaintiff's "same age, same educational level, same work experience." (Tr. 42). There is no reason to assume that the VE was lying when she said she had read the plaintiff's file and heard her testimony. This assertion of error is without merit.

The issue of reliance upon Dr. Purswani's findings has been dealt with above. As to the lack of manual dexterity, Dr. Purswani, upon whose findings the ALJ and VE relied, found only a "slight" loss of grip strength regarding a limitation in this area. The VE identified 12,000 jobs in the region which the plaintiff could perform with this limitation. There was substantial evidence in the record to support the ALJ's reliance on Dr. Purswani's report and thus the question to the VE.

The decision of the ALJ is supported by substantial evidence and he committed no reversible error. It is respectfully recommended that the plaintiff's Motion for Summary Judgment [Doc. 10] be DENIED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 14]be GRANTED.[3]

                                      Respectfully Submitted:

                                        s/ Dennis H. Inman
                                        United States Magistrate Judge

---

[3] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).